UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

JOVAN WILLIAMS,

        Plaintiff,

    v.                                                       Case No. 19-cv-1699-bhl

KRISTIN J. JENSEN, et al.,

        Defendants.

---

## DECISION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

---

Plaintiff Jovan Williams, a prisoner who is representing himself, filed this action under 42 U.S.C. §1983, alleging that Defendants Kristin Jensen, Wayne Nyiri, Susan Peters, Jean Lutsey, and Gary Maier violated his constitutional rights when they were deliberately indifferent to his serious mental health and medical conditions. The case is before the Court on Defendants' motions for summary judgment, which are fully briefed and ready for the Court's decision.[1] The Court will grant Defendants' motions and dismiss this case.

### BACKGROUND

At the time relevant to Williams' claims, Williams was a prisoner at the Green Bay Correctional Institution. He had been diagnosed with Antisocial Personality Disorder, Post-Traumatic Stress Disorder, Unspecified Mood Disorder with sleep disturbance, and Cannabis Use Disorder. Williams has a long history of self-harm, including hoarding and misusing medication. Dr. Michael Eis (not a Defendant) was Williams' primary psychiatrist. He noted that Williams

---

[1] On November 2, 2021, Williams filed a motion asking the Court to consider certain materials in the record that Williams did not cite in his response materials. Dkt. No. 114. Because Williams does not explain how these additional materials are relevant to the arguments in his response, the Court will deny his motion.

"did not have conditions that mandated treatment and that the majority of his issues stem from a personality disorder and that medication management of such is not directly achievable." According to Dr. Eis, when someone has a personality disorder, medications will not change the personality, but they can help the person with symptom care, such as mood instability or sleep disturbance. Dkt. Nos. 72, 106 at ¶¶1, 22, 34.

As of May 13, 2017, Williams had prescriptions for minocycline, muscle rub, and liquid APAP (Tylenol), which had been prescribed for a skin infection and complaints of migraines and back pain. He also had a prescription for trazodone, which is an antidepressant with a significant side effect of sedation. It was prescribed to Williams to help him sleep better. Finally, he had a prescription for sertraline, which is also a type of antidepressant and was prescribed to Williams to help stabilize his mood. The trazodone and sertraline had been reinstated by Dr. Eis less than a month earlier, on April 21, 2017. Prior to that, Williams' psychotropic medications were being held as a direct result of him habitually misusing them and threatening overdoses. Dkt. Nos. 72, 106 at ¶¶22, 24, 26, 28-29, 32, 55.

1. The May 13-14, 2017 Incident

On May 13, 2017, Williams asserts that he stopped correctional officer Nyiri at his cell front and showed him a handful of pills and a paperclip. Williams states that he told Nyiri that he was going to overdose with the pills and that Nyiri said "okay" and walked away. Nyiri agrees that, at about 11:30 p.m., Williams stopped him at his cell front and showed him an unfolded paperclip and about fifteen pills. However, according to Nyiri, Williams told him that he better notify the sergeant because he was going to take the pills. Nyiri asserts that he notified a sergeant that Williams threatened to take pills if a supervisor did not go to see him. Dkt. Nos. 72, 106 at ¶¶8, 10-11.

Williams asserts that he also stopped correctional officer Jensen at his cell front and showed her a handful of pills. He states that he counted the pills and then took them one by one while she watched. According to Williams, Jensen walked away and said, "I was tired of you yelling my name and bugging me anyways." Williams asserts that, after he swallowed the pills, he began to feel dizzy, confused, sweaty, and nauseous and that he threw up in his toilet. He states that he pressed his intercom button and eventually yelled to other inmates to make them aware of his condition. Dkt. Nos. 72, 106 at ¶9; Dkt. No. 107 at ¶10.

Jensen disputes Williams' version of this event. She asserts that, at about 12:07 a.m., Williams called her to his cell and showed her a handful of pills and an unfolded paperclip. After he counted out 19 pills, he took 1 pill with a carton of milk. Jensen asserts that she immediately notified a sergeant, told Williams to stop taking the pills, and ordered him to give her the paperclip. According to Jensen, she remained at Williams' cell front until the sergeant arrived. Jensen confirms that the pills Williams held in his hand matched the trazadone on the medication cart. Jensen explains that the sergeant spoke to Williams, Williams laid the paperclip on his bed as ordered, and then he exited his cell without incident, after which he was restrained and strip searched. Jensen and Nyiri searched Williams' cell, but they were unable to find any medication. Dkt. Nos. 72, 106 at ¶¶12-15, 17.

Jensen had observed Williams take only 1 pill; he was responsive, in no acute distress, and was breathing fine. But Williams insisted that he had taken 19 pills, so he was sent to the emergency room for evaluation. At the hospital, Dr. Zifferblatt noted that Williams was wide awake, his labs were within normal limits, his toxicology report was normal, he had normal chemistry, and he had a normal EKG. In the discharge papers, Dr. Zifferblatt noted, in part, that

Williams had been observed for 6 hours without any sign of sedation and that "[i]t is unlikely that he ingested what he states." Dkt. Nos. 72, 106 at ¶¶51-53; Dkt. No. 1009 at 19-28.

Williams returned to the institution at about 5:30 a.m. on May 14, 2017 and was placed in clinical observation until noon the next day when he denied any further thoughts of self-harm or intent. Williams asserts that he suffered from trembling, lightheadedness, thoughts of suicide, and sleepiness. Dkt. Nos. 72, 106 at ¶31; Dkt. No. 107 at ¶19.

## 2. Williams' Subsequent Treatment

On May 15, 2017, nurse Hannah Utter (not a Defendant) contacted Dr. Syed (not a Defendant) to inform him what had happened. Dr. Syed issued a verbal order to discontinue Williams' prescriptions for minocycline, muscle rub, and liquid APAP due to medication misuse. Nurse Practitioner Peters followed Dr. Syed's order and discontinued the medications. Health services also contacted psychiatrist Dr. Maier, who was covering for Dr. Eis; he issued a verbal order to discontinue Williams' prescriptions for trazodone and sertraline. Dr. Eis countersigned the order a few days later, agreeing that discontinuing Williams' psychotropic medications was the appropriate course of action. Dkt. Nos. 72, 106 at ¶¶31, 54-56; Dkt. No. 95 at ¶18.

On May 19, 2017, Dr. Eis met with Williams and noted that he was oppositional. Dr. Eis rejected Williams' demand that Dr. Eis restart his medications, concluding it was best to continue to hold Williams' psychotropic medications, subject to reconsideration if Williams showed appropriate behavior. Dr. Eis believed that Williams' behavior of hoarding medication and trying to overdose was directly related to his personality disorder and not a symptom being treated by the medications he had been prescribed. In other words, the medications were being used to provide symptom relief (mood instability and sleep disturbance), so taking them away would not alter the treatment for the cause of his destructive behavior, which was his personality disorder. Dr. Eis

concluded that Williams' risk of overdose far outweighed any benefit he may have been receiving from these medications. Dkt. Nos. 72, 106 at ¶¶22, 24, 26, 28-29, 32, 35, 36.

About a week later, on May 23, 2017, Williams was seen by health services for complaints of back and neck pain, headaches, hallucinations, panic attacks, anxiety, and an inability to focus. He wanted his prescriptions reinstated, but the nurse noted that she did not believe it was safe to give him any medication because he had recently misused his medication. The nurse instructed Williams to use a cool compress and relax when he got a headache. She also referred him to the psychological services unit for his other complaints. On May 30, 2017, Williams was again seen in health services for headaches, blurry vision, and fatigue. The nurse instructed Williams to wear his glasses to help with his vision and headaches, and she told him to work with psychological services on his sleep hygiene and to eat his complete meal tray for adequate nutrition. She also referred Williams' chart to nurse practitioner Peters. Dkt. Nos. 72, 106 at ¶¶56-58; Dkt. No. 96 at ¶7.

On June 25, 2017, Williams complained in writing to health services manager Lutsey about his dermatology issues and requested that his medications be reinstated. On July 3, 2017, Lutsey responded to Williams, informing him that he had been seen for his dermatological issues on June 14 (at which time T gel was applied), had been seen by physical therapy for his complaints of pain, and that medication posed a significant risk to him given his history of medication misuse. Williams' medical records indicate that Williams was not always cooperative with medical assessments and that he frequently refused subsequent treatment, which was required before his medication would be reinstated. Williams also continued to threaten misuse of medication, although officers could not tell if Williams was swallowing pills or balled up paper made to look like pills. Williams clarifies that he only ever misused his trazadone; he took all his other

5

medications as prescribed.  Dkt. Nos. 72, 106 at ¶59-60, 62-64; Dkt. No. 95 at ¶¶21, 23; Dkt. No. 96 at ¶6; Dkt. No. 107 at ¶21.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id*.  All reasonable inferences are construed in favor of the nonmoving party.  *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).  The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial."  *Siegel v. Shell Oil Co*., 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted).  "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts."  *Id*.  Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial."  *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

Williams asserts that Nyiri and Jensen violated his constitutional rights when they ignored his statements that he was feeling suicidal and planned to overdose on pills.  He also asserts that Dr. Maier and Peters violated his rights when they canceled his medications "cold turkey" and refused to prescribe alternative treatments and that Lutsey violated his rights when she failed to

6

reinstate his prescriptions. For the reasons explained below, Williams' claims fail as a matter of law.

1. **Nyiri and Jensen Are Entitled to Summary Judgment Because It Is Undisputed that Williams Did Not Suffer Serious Harm as a Result of His Alleged Overdose.**

The Eighth Amendment prohibits "cruel and unusual punishments" and "imposes a duty on prison officials to take reasonable measures to guarantee an inmate's safety and to ensure that inmates receive adequate care." *Phillips v. Diedrick*, No. 18-C-56, 2019 WL 318403 at \*2 (E.D. Wis. Jan. 24, 2019) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). "Their duty extends to protecting inmates from imminent threats of serious self-harm, and the 'obligation to intervene covers self-destructive behaviors up to and including suicide.'" *Szopinski v. Koontz*, 832 F. App'x 449, 451 (7th Cir. 2020) (quoting *Miranda v. Cty. of Lake*, 900 F.3d 335, 349 (7th Cir. 2018)).

Questions of fact exist regarding the interactions between Williams and the officers. Williams asserts that his suicidal feelings were genuine and that he was clear and specific about his intentions and that he carried through on his threats by swallowing about 19 trazadone pills. Nyiri asserts that Williams only told him to notify a sergeant, which he did, and Jensen asserts that she immediately notified a sergeant, stayed by Williams' cell, and observed him swallow only 1 of the 19 pills. Notwithstanding these disputed facts, Nyiri and Jensen are entitled to summary judgment because, "[i]n order to succeed in a § 1983 suit, a plaintiff must 'establish not only that a state actor violated his constitutional rights, but also that the violation *caused* the plaintiff injury or damages." *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1032 (7th Cir. 2019) (quoting *Roe v. Elyea*, 631 F.3d 843, 864 (7th Cir. 2011)) (emphasis in the original). Williams fails to do this.

The evidence shows that Williams experienced, at most, nausea with a single incident of vomiting, dizziness, and sleepiness. Although Williams was immediately transported to the

7

emergency room as a precaution, records indicate that he was observed for 6 hours without any signs of sedation other than mild sleepiness, he was alert, all labs were within the normal limits, his EKG was normal, he was negative for aspirin and acetaminophen, and he had a negative toxicology report.[2] Williams asserts that, the next day (after having been awake all night), he felt trembly and really sleepy, but "[b]y any measure, the injuries were trivial—indeed, almost nonexistent." *Lord v. Beahm*, 952 F.3d 902, 905 (7th Cir. 2020); *see also Gayton v. McCoy*, 593 F.3d 610, 621 (7th Cir. 2010) ("Vomiting, in and of itself, is not an uncommon result of being mildly ill, and, absent other circumstances . . . does not amount to an objectively serious medical condition."). Thus, Williams' claim "fails on the basic proposition that he has sued for damages under § 1983 and alleged a constitutional tort (an Eighth Amendment violation) without then developing evidence of a recoverable injury." *Lord*, 952 F.3d at 905; *see also Madlock v. Shannon*, No. 19-CV-410-JDP, 2021 WL 980916, at *1 (W.D. Wis. Mar. 16, 2021) (holding that plaintiff who vomited, felt light-headed and had temporary, elevated levels of acetaminophen "failed to identify any evidence that he was actually injured in his self-harm attempt"). Nyiri and Jensen are entitled to summary judgment on Williams' claim.

2. **Maier and Peters Are Entitled to Summary Judgment Because the Discontinuation of His Medication Was Not the Result of Deliberate Indifference to His Serious Conditions.**

"[O]nly the unnecessary and wanton infliction of pain implicates the Eighth Amendment. . . . [T]he Eighth Amendment does not apply to every deprivation, or even every unnecessary deprivation, suffered by a prisoner, but *only* [to] that narrow class of deprivations involving 'serious' injury inflicted by prison officials acting with a culpable state of mind." *Snipes v.*

---

[2] Williams highlights that, while the records initially note that he reported taking trazodone (Dkt. No. 77-1 at 21); they later note that he reported taking tramadol (i*d.* at 28). From this, Williams concludes that the hospital failed to test him for the correct drug, but the hospital did not perform a drug-specific screening. Instead, it screened for numerous drugs, none of which were present, and performed a complete blood count evaluation and a comprehensive metabolic panel, both of which were within normal ranges. *Id*. at 24-26.

8

*DeTella*, 95 F.3d 586, 590 (7th Cir. 1996) (quoting *Hudson v. McMillian*, 503 U.S. 1, 19 (1992) (Thomas, J., dissenting)). The Seventh Circuit has repeatedly emphasized that "the Eighth Amendment is not a vehicle for bringing claims for medical malpractice." *Id.* (citing *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)). Thus, "[m]edical decisions that may be characterized as classic example[s] of matter[s] for medical judgment such as whether one course of treatment is preferable to another, are beyond the Amendment's purview. Such matters are questions of tort, not constitutional law." *Id.* at 590-91 (internal citations and punctuation omitted).

Dr. Maier is entitled to summary judgment on Williams' claim that he violated the Eighth Amendment when he canceled Williams' prescriptions for psychotropic medications following his alleged overdose because his decision was a classic example of a medical professional exercising his medical judgment. Williams' psychiatrist explained that, while the prescribed medications helped with Williams' sleep disturbances and mood instability, they did not treat the cause of his destructive behavior, which was his personality disorder. Williams' psychiatrist believes that Williams hoarding and misusing medication is directly related to his personality disorder. Accordingly, his psychiatrist concluded that the risk of overdose far outweighed any symptom-relief Williams may have been receiving from the psychotropic medications. Williams may disagree with the decision to prioritize his safety over his comfort, but his disagreement is insufficient to establish a violation of the Eighth Amendment. *See Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003). And, on this record, no reasonable jury could conclude that the decision to prioritize Williams' safety by suspending his psychotropic medications until Williams could demonstrate appropriate behavior was "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). Dr. Maier is entitled to summary judgment.

9

Peters is also entitled to summary judgment. Following Williams' alleged overdose, a nurse contacted Williams' treating physician who ordered Peters to discontinue Williams' medications for his rashes, headaches, and body pains. Peters was entitled to defer to the treating physician's instructions because it was not apparent that his order would likely harm Williams. *See Holloway v. Delaware County Sheriff*, 700 F.3d 1063, 1075 (7th Cir. 2012). In fact, given Williams' repeated threats that he would misuse his medication to harm himself, it was obvious that the order to discontinue his medications was made to keep him safe. Again, while Williams may disagree with the decision to prioritize his safety over his comfort, his disagreement is not sufficient to establish an Eighth Amendment violation.

Further, it is not clear what, if any, involvement Peters had in Williams' subsequent requests for treatment, but even assuming she had some involvement in those decisions, the evidence shows that health services did not ignore Williams' complaints. In response to his complaints of headaches and vision concerns, he was advised to use cold compresses, to wear his glasses, and to get adequate nutrition. He was also referred to psychological services for strategies for good sleep hygiene and to reduce his anxiety. In response to his complaints of a skin rash, T gel was applied, which resolved the rash. Although Williams would have preferred that his medications be reinstated, a prisoner has no constitutionally protected right to the treatment of his choice. *See Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008). Given Williams' long history of medication misuse, no reasonable jury could conclude that pursuing treatments other than medication for Williams' complaints represented "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008). Peters is entitled to summary judgment.

### 3. Lutsey Is Entitled to Summary Judgment Because She Permissibly Deferred to Williams' Treating Providers' Decisions.

Williams asserts that Lutsey violated the Eighth Amendment because she ignored his many complaints about the medical treatment he was receiving (or not receiving). Based on the evidence, no jury could reasonably agree with his assertion. "If a prisoner is under the care of medical experts, a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011). Thus, as the health services manager, Lutsey was entitled to defer to Williams' treating physician and psychiatrist's instructions to discontinue his medications unless those instructions posed an obvious and serious risk to Williams' health. As discussed above, they did not. After examining Williams' records, Lutsey was aware of his long history of medication misuse. She also was aware that Williams was not being ignored: He had been given guidance by health services, psychological services, and his psychiatrist on ways to address his many complaints without medication. Although Williams preferred to use medication and although medication may have provided greater relief for some of his symptoms, Lutsey was entitled to defer to his treating providers' decision that it was unsafe for Williams to be prescribed medication. She is entitled to summary judgment.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' motions for summary judgment (Dkt. Nos. 71, 78) are **GRANTED,** Williams' motion that the Court consider materials not cited in his response materials (Dkt. No. 114) is **DENIED**, and this case is **DISMISSED**. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin on November 30, 2021.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge

---

This order and the judgment to follow are final. Plaintiff may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **30 days** of the entry of judgment. *See* Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). If Plaintiff appeals, he will be liable for the $505.00 appellate filing fee regardless of the appeal's outcome. If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* with this Court. *See* Fed. R. App. P. 24(a)(1). Plaintiff may be assessed another "strike" by the Court of Appeals if his appeal is found to be non-meritorious. *See* 28 U.S.C. §1915(g). If Plaintiff accumulates three strikes, he will not be able to file an action in federal court (except as a petition for habeas corpus relief) without prepaying the filing fee unless he demonstrates that he is in imminent danger of serous physical injury. *Id.*

Under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment. The Court cannot extend these deadlines. *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.